AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

Southern _____ DISTRICT OF ___California___

**FILED**

07 MAY 25 AM 10: 16

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

### In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

11358 Silver Oak Lane, San Diego, California

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: '07 MJ 1174

*ORDERED SEALED BY COURT*

I, ___Special Agent Mark Weber___ being duly sworn depose and say:

I am a(n) ___Special Agent of the Internal Revenue Service___ and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A

in the ___Southern___ District of ___California___
there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of violations of Title 26, United States Code, Sections 7201, 7206(1); and Title 31, United States Code, Section 5324(a)(3).

concerning a violation of Title _____ United States code, Section(s) _____

The facts to support a finding of probable cause are as follows:

See attached Affidavit of Special Agent Mark Weber continued on the attached sheet and made a part hereof.

Continued on the attached sheet and made a part hereof:    ☑ Yes    ☐ No

_Signature of Affiant_

Sworn to before me and subscribed in my presence,

___May 25, 2007___  at  ___San Diego___  ___California___
Date                           City              State

___Anthony J. Battaglia___  ___U.S. Magistrate Judge___
Name of Judge              Title of Judge

_Signature of Judge_

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Mark Weber, being duly sworn, depose and declare the following:

**INTRODUCTION**

1. I make this affidavit in support of applications for search warrants for the following premises: (1) 4701 University Avenue, San Diego, California (the business location for Travel World Services #3., as more fully described in Attachment A-1, herein incorporated by reference); and (2) 11358 Silver Oak Lane, San Diego, California 92131 (the residence of Tammie Thu Huynh, and the detached garage on the property, as more fully described in Attachment A-2, incorporated herein by reference).

2. Based on the facts set forth herein, I submit there is probable cause to believe that Tammie Huynh has committed the following offenses: (a) evasion of income tax, in violation of 26 U.S.C. § 7201; (b) fraud and false statement, in violation of 26 U.S.C. § 7206(1); and (c) structuring transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3). Based on the facts set forth herein, I also submit there is probable cause to believe that evidence of these offenses will be found at the above-described locations.

3. This affidavit is based upon information gained by me from several sources, including, but not limited to, bank records, property records, confidential sources, surveillance, a review of Internal Revenue Service (IRS) databases, analysis of federal income tax return information, a review of immigration records, and knowledge gained from my training and experience. Because this affidavit is written and offered for the limited purpose of establishing probable cause for the issuance of search warrants, it does not contain all of the information that the government possesses relative to this investigation.

**TRAINING AND EXPERIENCE**

4. I am a Special Agent with the Internal Revenue Service (IRS), Criminal Investigation in the San Diego Field Office. I have been a Special Agent since January 1992. In addition, I earned a Bachelor of Science in Finance from Oklahoma State University.

5. In the past fifteen years as a Special Agent, I have been involved in numerous cases involving federal income taxes and other complex financial crimes. I have written numerous affidavits for search warrants and seizure warrants. I have been the primary case agent in cases involving income tax evasion and subscribing to and filing false income tax returns. I have participated in numerous income tax related search warrants. I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. As part of this program, I attended approximately six months of criminal investigation training. My training courses included but were not limited to criminal law, constitutional law and enforcement techniques including search warrants. This training also encompassed classroom training on the principles of Federal taxation of individuals, corporations, and partnerships. The classroom training in tax included analyzing tax returns, filing requirements, statutes of limitation, gross income, inclusions and exclusions, deductions and losses.

6. Based on my training and experience, I know that income tax liability can frequently be determined by reviewing and examining various business and financial records such as general ledgers, subsidiary ledgers, cash receipts journals, cash disbursement journals, payroll journals, bank records, receipts, invoices, worksheets, schedules, forms, calendars, logs, and tax returns. Based on my experience, I know that individuals and businesses often keep such records, even if they were not used for the preparation of tax returns. Moreover, I know that

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

individuals often maintain such records for long periods of time. Such records are used for loans, investments, credit card applications, and financial planning, including estate planning.

7. Based upon my training and experience, I know that accounting records for sole proprietor businesses are frequently prepared by the owner at the business location where the business transaction occurred. I also know that these records are frequently stored and maintained at other locations such as residences, home-offices, vehicles, garages, businesses, briefcases, storage units, computers, hard drives, and disks.

8. Based upon my training and experience, I know that some owners of small, cash-intensive businesses skim cash receipts and hide this income from the IRS. From my training and experience, I also know that to obtain a loan or other financing, such as a home loan, documentation to support earned income, such as tax returns, is often needed to qualify for the loan.

9. From my training and experience, I know that it is an established principle of Federal tax law that income is generally taxed to the person or entity who earns, benefits from, and directs the use of, such income. Moreover, Title 26 of the United States Code, Section 61 defines gross income as "all income from whatever source derived," including compensation for services and gross income from a business.

## SUMMARY OF INVESTIGATION

10. The investigation began on Tammie Huynh when the IRS became aware that Huynh was making large and recurring currency deposits into her business accounts named Travel World Services #3 (TWS#3). Based upon my prior investigations in the travel industry, I know that it is somewhat unusual for a travel agency to receive currency for payment of services and quite peculiar for the majority of bank deposits for a travel agency to be made in currency

(particularly in $100 bills - a common denomination in her deposits).  Other IRS Special Agents were able to obtain Huynh's business and personal bank account information prior to my involvement in the investigation.  Initial comparisons of bank deposit volume to reported gross receipts showed substantial underreporting for the business as detailed below.  Further financial analysis shows that Huynh is spending more on personal expenditures than her reported gross income, particularly with the purchase of a house in September 2005.  The following paragraphs compare the tax returns filed by Huynh to TWS#3 bank account activity and her personal expenditures.

## TAX RETURN FILING HISTORY

11.  IRS records indicate that Individual Federal Income Tax Returns (Form 1040) in the name Tammie T. Huynh, SSN 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, have been filed electronically[1] for tax years 2004 and 2005.  On both returns Huynh's filing status was Head of Household, listing one child as a dependent.  IRS records show that Huynh has filed an extension for the filing of her 2006 Form 1040, received by the IRS on April 15, 2007[2].  Huynh included an estimated payment of $700.00 with the extension, which represents the total estimated payments submitted for tax year 2006.  The following is a summary of significant tax information reflected on the 2004 and 2005 returns:

| Tammie Huynh's Form 1040 Tax Return Line # / Description: | Tax Year Ending 12/2004 | Tax Year Ending 12/2005 |
|---|---|---|

---

[1] Both returns were prepared by The Tax Business, Winchester, California.  The preparer filed the returns per written acknowledgement from Huynh.

[2] Extensions do not include calculations of gross receipts or adjusted gross income.  Substantial penalties and interest do apply if the estimated payments are insufficient for the tax due and owing for the future Form 1040.

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

| | | |
|---|---|---|
| 8a.  Taxable Interest | $ 433 | $ 216 |
| 12.  Business Income (Travel World Services 3) | 20,777 | 17,493 |
| 17.     Rental Real Estate Losses / Partnership Income (Mobile 1 Wireless) | -0- | 7,671 |
| **36.  ADJUSTED GROSS INCOME** | **19,742** | **24,144** |
| 39./42.  Item'd Deductions / Exemptions | (15,459) | (22,611) |
| 57.  Income Tax Due | -0- | -0- |
| 58.  Self Employment Taxes (based upon TWS#3 income / line # 12.) | (2,936) | (2,472) |
| 65a./67.  Earned Income / Child Credits[3] | 2,268 | 1,892 |
| **74.  TAX PAID** | **$ 668** | **$ 580** |

12.  As noted on line # 12 above for business income, a Schedule C Profit or Loss From Business was attached to Huynh's 2004 and 2005 returns.  The Schedule C lists the service as a travel agency, business name "Travel World Services 3", business address "4701 University Avenue, San Diego, California."  Both of the Schedule C's show "Travel World Services 3" as a sole proprietor business owned by Huynh.  Travel World Services #'s 1, 2, and 4 are owned separately from Huynh according to public records.  The following is a summary of tax data reflected on the Schedule C's:

| Travel World Service 3 Line Item on Schedule C: | For the year ended December 31, 2004 | For the year ended December 31, 2005 |
|---|---|---|
| 1.  Total Sales | $ 498,629 | $ 526,080 |

---

[3] Earned Income Credit and child tax credits are available only to lower income taxpayers.

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

| 4. Cost of Goods Sold | (460,982) | (491,263) |
|---|---|---|
| 7. Gross Profit | 37,647 | 34,817 |
| 28. Total Expenses | (16,870) | (17,324) |
| 31. Net Income | $ 20,777 | $ 17,493 |

13. I reviewed bank records for TWS#3, customer address 4701 University Avenue, San Diego, California from both Bank of America and Union Bank of California for the time period April 8, 2004[4] through July 26, 2006. I compared total sales for TWS#3 as reported on Huynh's 2004 and 2005 Schedule Cs (detailed above) to bank records for the business as shown below:

| Bank Deposits vs. Tax Returns | Tax Year Ending 12/2004 | Tax Year Ending 12/2005 |
|---|---|---|
| Business Bank Deposits[5] | $ 947,086 | $ 1,469,441 |
| Schedule C(line 1): Total Sales | 498,629 | $ 526,080 |
| Omitted Gross Receipts | $ 448,457 | $ 943,361 |

14. Based on the comparison of Huynh's tax returns to bank statements, Huynh had underreported TWS#3 total sales by approximately $450,000 in 2004 and $940,000 in 2005. If these sales figures would have been properly accounted for on Huynh's tax return, her taxes would have gone up quite substantially compared to her payments of $668 and $580 per year respectively. Correspondingly, Huynh submitted a $700 payment for her estimated 2006 income taxes as noted above. I analyzed the same TWS#3 business account as detailed above for the first 7 months of 2006 and calculated that she deposited approximately $825,000 during that

---

[4] Bank records and a fictitious name business filing indicate April 8th as Huynh's start date for TWS#3.

[5] TWS#3 bank records approximate December 31st because bank statements do not end on that date. October and November 2005 bank records were neither available nor included in these calculations.

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

1    period, a pace faster than the prior two years.

2        15.  A partnership named Mobile 1 Wireless (Mobile 1) was listed on Huynh's 2005 tax

3    return's Schedule E Supplemental Income and Loss. · Huynh lists the $13,499 income as non-

4    passive, indicating she actively participated in the business.  A Form 1065 Return of Partnership

5    Income was filed for 2005 for Mobile 1, reporting total income of $21,840 and total deductions

6    of $7,630.  To date, a Form 1065 for Mobile 1 has not been filed for 2006.  According to records

7    at Bank of America, a checking account for Mobile 1 was opened on November 22, 2005 though

8    that account was closed in September 2006.  The bank records reflected approximately $12,000 a

9    month in deposits through the first half of 2006.  According to publicly available Business

10   Registrations and recent surveillance, Mobile 1 is located at 4701 University Avenue, San Diego,

11   California.

12   **PERSONAL EXPENDITURES**

13       16.  I reviewed Tammie Huynh's personal bank records and compared them to her tax

14   returns.  Huynh's personal checking account deposits at Bank of America were approximately

15   $44,983 and $193,287 in 2004 and 2005 respectively[6].  Huynh's personal money market account

16   deposits at San Diego County Credit Union (SDCCU) were approximately $400 in 2004 and

17   $18,000 in 2005.  Huynh's personal account deposits far exceed her reported Adjusted Gross

18   Income (AGI) for 2004 [$19,742 AGI versus over $45,000 in deposits] and particularly for 2005

19   [$24,144 AGI versus over $211,000 in deposits].

20       17.  On November 2, 2004, Huynh purchased a used 2001 Mercedes Benz S500 for

21   $35,058.  Huynh borrowed the entire purchase amount from SDCCU though she has paid

22   $769.74[7] per month since then, totaling $9,236 in 2005 alone.  On the car loan application with

23   SDCCU, Huynh indicated that her gross monthly pay was $7,250 from Travel World and other

24

---

25   [6] Some of the deposits are attributable to the purchase of 11358 Silver Oak Lane in September 2005.
   [7] The payment due was $569.74.  Huynh paid $200 more per month than required by the loan agreement.

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

1   unspecified monthly income of $2,131, totaling $9,381 per month [annualized: $112,572].

2       18.  Beyond Huynh's recurring personal expenditures detailed above, she purchased a

3   newly constructed house at 11358 Silver Oak Lane, San Diego, California on September 28,

4   2005, for $973,567.  Huynh borrowed $600,000 and put $370,122 down.  The sources of the

5   down payment were as follows:  $15,000 personal check for earnest on June 15, 2005;  $105,122

6   Cashier's Check via withdrawal from Huynh's personal account; and $250,000 Cashier's Check

7   via withdrawal from her sister Julie Huynh's personal account.  Based upon my analysis, it

8   appeared that in the five months prior to the purchase both Tammie's and Julie's bank accounts

9   received approximately $178,380 in currency deposits which can be directly attributed to the

10  above stated down payments.  As detailed in the suspect banking activity section below, the

11  individual currency deposits never exceeded $10,000 though on several days in September 2005

12  the cash deposits in Julie's and Tammie's accounts combined were well over $10,000.  For

13  example, the following currency deposits occurred on September 7, 2005:  $9,000 (SDCCU-

14  Tammie); $6,750 (UBOC-TWS#3); and $9,000 (SDCCU-Julie).  Also on September 8, 2005,

15  currency deposits were $9,000 (SDCCU-Tammie) and $9,000 (SDCCU-Julie).  This type of

16  banking activity was also prevalent throughout the TWS#3 accounts as detailed below.

17  **SUSPECT BANKING ACTIVITY**

18      19.  I analyzed Huynh's business and personal bank accounts for TWS#3 at Union Bank

19  and Bank of America from April 8, 2004 through July 26, 2006 (accounting for tax years 2004,

20  2005 and partial 2006).  Upon analysis of TWS#3's Union Bank accounts, I noticed that no

21  single cash deposit exceeded $10,000 despite over $1.7 Million in cash deposits in this account

22  alone.  The $10,000 currency transaction threshold is significant in that if a bank account holder

23  transacts (generally deposits or withdraws) over $10,000 in currency the bank is required to file a

24  Currency Transaction Report (CTR) which in turn can be viewed by the IRS and law

25  enforcement agencies.  I know based upon previous investigations that some account holders

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

1  wittingly "structure" their currency deposits into their accounts to avoid the filing of a CTR. I

2  believe, based on the following two paragraphs descriptions, that Huynh is structuring her

3  individual deposits below $10,000 each to evade the filing of a CTR.

4      20.  An Officer at Union Bank of California (UBOC) informed me that between April 8,

5  2004[8] and October 28, 2005, account deposits into TWS#3 totaled $2,383,266 of which

6  $1,787,430 was currency (approx. 75%), the balance was in checks and money orders. UBOC

7  did not file a single CTR during this time period. The Officer informed me that during some

8  weeks, large currency deposits were made every day.  For example, during the week of

9  September 12th – 16th, 2005, the TWS#3 account had cash deposits per day as follows:  $9,800;

10  $9,800; $8,900; $9,800; and $9,800.  The following week of September 19th – 23rd, 2005, the

11  following currency deposits were made each day into TWS#3:  $9,800; $9,800; $9,700; $9,800;

12  and $9,800.

13      21.  An Officer at Bank of America informed me that between April 1, 2005 and May 25,

14  2006, the TWS#3 checking accounts had deposits of $1,041,207 of which $619,840 was in

15  currency.  The Officer told me that on the same day cash deposits were sometimes split between

16  Huynh's personal and business bank accounts, neither deposit individually exceeded $10,000 but

17  combined they did exceed $10,000.  The checks deposited into her business account were

18  generally from individuals or small businesses, the memo often noting something about travel,

19  airlines, or tickets.  The Officer told me that on January 3, 2006, Huynh attempted to deposit

20  $13,450 in currency, intended to be split $6,950 to her business account and $6,500 to her

21  personal account.  Accordingly, when the bank teller informed Huynh about the requirement to

22  file a CTR, Huynh canceled the $6,500 deposit to her personal account but still deposited $6,950

23  into the business account.  The Officer told me that the activity described above has continued

24

25
_____
[8] Huynh took over TWS#3 on April 7, 2004, from her brother William according to CA fictitious business filings.

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

-9-

into 2007. The Officer said that between December 7, 2006 and March 26, 2007, TWS#3's account has received deposits of approximately $481,890, consisting of $368,230 (76%) in currency and the balance in checks. Similar to earlier patterns, currency deposits never exceeded $10,000 in a single transaction though some individual currency deposits were as close as $9,800.

22. I reviewed the checks written on TWS#3's account at Bank of America, which is detailed above. The checks written from the account went to four distinct categories: traditional business expenses such as rent; payments to airline consolidators (wholesalers to travel agents); large payments to Huynh's personal credit cards (nearly 75% of expenditures); and recurring checks payable to "I.N.S." for $170 each [see paragraph 24]. Analysis of Huynh's five primary credit cards reflects that she her charging activity is for the purchase of airline tickets, often for multiple passengers and regularly to foreign destinations.

23. I analyzed bank account records for Tammie Huynh's personal money market account at SDCCU. While reviewing deposits from 2004 through 2006, I noted that two $9,000 currency deposits were made on September 7th and 8th, 2005, respectively. SDCCU also has not filed CTRs on Huynh. Tammie Huynh's sister, Julie, also has bank accounts with SDCCU. I analyzed Julie's account since she substantially assisted in Tammie's purchase of a residence in September 2005 [see paragraph 18]. I noticed that between August 26th and September 8th, 2005, Julie's accounts had eight individual deposits with $9,000 currency on eight different days, totaling $72,000. Julie's accounts in question had been fairly inactive prior to these deposits, rarely receiving cash deposits of this size or frequency. This may have been an attempt to enlist Julie's assistance in structuring cash deposits since at this same time Tammie's accounts were receiving the large currency deposits described above.

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

## CHECKS TO THE I.N.S.

24.  I reviewed a specific category of checks ($170 each / 20-30 per month) written on the TWS#3 account at Bank of America for the time period April 1, 2005 through May 25, 2006. I noticed that each of these $170 checks (141 total) were made payable to the I.N.S.  Upon inspection of the endorsements on the checks, I saw that the checks were deposited by the United States Immigration and Naturalization Service (INS).  Each check had a different handwritten name, date of birth, and number beginning with the letter 'A' followed by eight numbers.  I contacted a Special Agent with the Immigration and Custom Enforcement (ICE) agency within the Department of Homeland Security.  The ICE agent informed me that the 'A' number described above is a number assigned by the former INS to immigrants who arrive in the United States and request citizenship.  The ICE agent reviewed a sampling of these checks and researched her agency records for matches.  The ICE agent determined that the names, dates of birth, and A numbers exactly matched INS records for immigrants, in particular immigrants whose status in the United States is based upon a request for asylum or refugee status.  The ICE agent stated that many immigrants came to the U.S. from Vietnam as refugees, just as Huynh, her parents, and her siblings did in November 1982.  Further account analysis in the account detailed above revealed that between December 7, 2006 through March 26, 2007, 97 more checks for $170 each were made payable to the "I.N.S."

## UNUSUAL BUSINESS ACTIVITIES

25.  A Staff Service Manager for the Seller of Travel Program, a section of the Public Rights Department of the California Attorney General's Office, advised me that the state requires registration of travel agents or "sellers of travel."   A seller of travel, as defined by the state, sells, provides, furnishes, contracts for, arranges, or advertises that he or she may arrange, or has

1   arranged, wholesale or retail air or sea transportation, either separately or in conjunction with

2   other travel services. The registration is with the Office of the Attorney General, Consumer Law

3   Section-Seller of Travel Program. I was told that TWS#3 has not registered as a seller of travel,

4   even after recent notification that she was in violation of this statute.

5        26. Based upon my prior investigations on travel agencies, I know that travel agencies

6   traditionally use travel reservation systems such as SABRE to make airline reservations.

7   According to my research and bank account analysis, TWS#3 does not use SABRE or any other

8   common reservation system. I also know that some travel agencies use the Airline Reporting

9   Corporation (ARC) to facilitate the purchase of airline tickets for clients, often paying at an

10  approximate 5% discount from retail (the primary revenue source for travel agencies for air

11  travel business). Based upon my analysis of Huynh's business bank accounts, TWS#3 does not

12  buy tickets through ARC. Instead it appears Huynh purchases approximately 80% of her clients'

13  airline tickets by charging her personal credit cards, paid monthly via the TWS#3 accounts. It

14  appears the balance of airline tickets are purchased through travel consolidators.

15

16  **PROBABLE CAUSE TO SEARCH TRAVEL WORLD SERVICE #3 / MOBILE 1**

17  **WIRELESS, 4701 UNIVERSITY AVENUE, SAN DIEGO, CALIFORNIA**

18       27. On April 7, 2004, Huynh filed a Fictitious Business Name for TWS#3 listing

19  herself as the owner. Other public records list Huynh as owner and president of Mobile 1.

20  Federal income tax records support her active involvement and ownership status in both

21  businesses. Since May 2004 TWS#3's and since November 2005 Mobile 1's bank statements

22  have been and are being sent to 4701 University Avenue. Since May 2003 Huynh's personal

23  bank records and credit card statements have been sent to 3881 47th Street, a duplex residential

24  location which is attached behind 4701 University Avenue. Huynh has recently written rent

25

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

-12-

checks on her business account, notating "Rent 4701-3881." I noticed that down the hall from the duplex were multiple doors without windows which could be used as storage locations.

28.    On March 26, 2007, during surveillance conducted at TWS#3 and Mobile 1, two IRS Special Agents observed an employee who matched the description of Tammie Huynh sitting behind a desk. Huynh was observed speaking Vietnamese to two customers while typing on a computer. Huynh and the customers were talking about travel tour packages and that the tour included transportation as well as meals if the customers desired. One of the customers was holding a plastic airline ticket holder labeled "Asiana Airlines" on it. The Special Agents observed a world map on the wall next to Huynh's desk as well as some travel posters of Hong Kong, Alaska, and Manila. Located behind Huynh's desk were two filing cabinets, each with four or five drawers. Before departing the Special Agents picked up a brochure labeled, "2007 Travel Agent Tariff" and several brochures advertising cell phones and rate plans. The Special Agents noticed a display of cell phones on a wall and a customer seating area for them. On May 18, 2007, I verified that the businesses are still operating at this address. Based on the foregoing, I submit there is probable cause to believe that the aforementioned business records and personal records are stored 4701 University Avenue, San Diego, California.

**PROBABLE CAUSE TO SEARCH TAMMIE HUYNH'S RESIDENCE**

**11358 SILVER OAK LANE, SAN DIEGO, CALIFORNIA**

29. Records maintained by the San Diego County Recorder's Office confirm that Tammie Huynh purchased and still owns 11358 Silver Oak Lane, San Diego, California. On Huynh's federal income tax return for the year 2005 (the most recently filed), Huynh shows her address as 11358 Silver Oak Lane. Records obtained from San Diego Gas and Electric confirm that Huynh initiated service at this house and continues to make payments on it. On March 27

and 28, 2007, in the evening, an IRS Special Agent conducted a drive-by of 11358 Silver Oak Lane and observed a silver four-door Honda, California license plate number 4HRH182 parked in front of the residence.  According to the California Department of Motor Vehicles, this vehicle is registered to Tammie Huynh.  In May 2007, I was informed by the U.S Postal Service that Huynh does receive mail at this location.  On May 22, 2007, a "trash run" at her residence revealed numerous financial statements from banks and credit card issuers which had been addressed to either 4701 University or 3881 47th Street.  Her trash included partially torn check carbon copies from both the Mobile 1 and TWS#3 accounts detailed above, empty envelopes addressed to TWS#3, and cable bills addressed to the house.  Based on my training and experience, I am aware that it is common for small business owners to prepare, maintain, or store business and banking records at their business and at their residence, including outlying buildings on their property.  I also know based upon my participation in dozens of financially oriented search warrants that individuals commonly store records relating to their personal income and finances at their residence even if their correspondence is delivered to auxiliary locations, such as post office boxes or mail drops.

## COMPUTER EQUIPMENT AND PERIPHERALS – BOTH LOCATIONS

30.  Based on my own training and experience, and my consultations with IRS-CID computer specialists, I know that information may be stored as electronic data.  Electronic data is accessed using electronic devices including computers, Personal Digital Assistants, memory typewriters, and any other device capable of functioning in a similar manner.  The storage media this electronic data could be stored on includes but is not limited to, fixed disks permanently installed in computers, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, compact discs, recordable DVD's,

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

removable "flash" media, or other memory storage devices.

31.    Electronic data is more fully described as information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer related equipment as well as Personal Digital Assistants. Electronic data can be stored in formats including but not limited to computer files, documents, images, databases, and spreadsheets.

32.    To access and view electronic data, it is necessary to use corresponding computer software programs. On some occasions, this software is unique or outdated software. On these occasions, it is necessary to seize the computer software and related instruction manuals in addition to the electronic data in order to correctly access and view the electronic data. If the software cannot be separated from the device it runs on, it may be necessary to remove the entire electronic device and related peripherals in order to run the software to access the electronic data.

33.    On some occasions, electronic data and software are protected by passwords, encryption, compression, or other data security measures which are designed to restrict access to or hide electronic data and software. Electronic data and software protected by passwords, encryption, compression, or other data security measures require special care by data analysts when accessing the data. Based on my own knowledge and experience, and my consultations with IRS computer specialists, I know that data analysts use several different techniques to search electronic data for evidence or instrumentalities of crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain; "opening" or reading the first few "pages" of selected files to determine their contents; scanning for deleted or hidden data; and searching for key words or phrases ("string phrases").

34.    In preparing this affidavit, I consulted with Computer Specialist, Special Agent

David White.  Special Agent White has been a Special Agent for the IRS for approximately 10 years and has been involved in approximately 30 search warrants, nearly all of which involved the seizure of electronic equipment.  Special Agent White has informed me that the preferred method of searching electronically prepared and stored data requires the seizure of electronic equipment.  Moreover, the analysis of any seized items should subsequently be conducted by a qualified computer specialist under controlled conditions in a laboratory setting away from the search site.

35.  Alternatively, computers can be imaged on site during the execution of the warrants.  However, this method may be impractical due to technical considerations such as complicated computer hardware or the sheer volume of hard drive data storage.

36.  From my consultations with IRS computer specialists, I also know that searching and seizing information from computers often requires agents to seize most or all electronic devices and related peripherals and storage media to be searched later by a qualified computer expert in a laboratory or other controlled environment.  This is true because of the following:

The volume of evidence: Computer storage media (such as hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information.  Additionally, an individual may try to conceal criminal evidence.  He or she might store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instruments of the crime.  This sorting process can take weeks, depending on the volume of data stored, and it is impractical to attempt this kind of data search on site.

Technical requirements:  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast

AFFIDAVIT OF MARK WEBER IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

array of computer hardware and software available requires even computer experts to specialize in some systems and applications. It is difficult to know, before a search, which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover "hidden," erased, compressed, password protected, or encrypted files. Since computer evidence may be extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from a destructive code imbedded in the system known as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

## CONCLUSION

37. Based on the facts set forth herein, I submit there is probable cause to believe that Tammie Huynh dba Travel World Services #3, has significantly understated gross receipts and business income. Correspondingly Tammie Huynh has understated her personal income on Forms 1040 Federal Income Tax Returns for the years 2004 and 2005 as well as grossly under-estimated her 2006 taxes due. I also submit there is probable cause to believe that Tammie Huynh has purposely and wittingly structured currency deposits into her business and personal bank accounts from April 2004 through March 2007. Based on the facts set forth herein, I submit there is probable cause to believe that evidence of violations of (a) evasion of income tax, in violation of 26 U.S.C. § 7201; (b) fraud and false statement, in violation of 26 U.S.C. § 7206(1); and (c) structuring transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3), as set forth in Attachment B hereto, will be found at the locations described in Attachment A. The business, tax, and financial records described in Attachment B are sought to determine the correct gross receipts and net income for Travel World Services #3, Mobile 1

Wireless, and subsequently Tammie Huynh.

38.    This is an ongoing investigation.    Premature disclosure of the contents of this affidavit could result in the destruction or concealment of evidence by the subject of the investigation.    Accordingly, I respectfully request that the Court file this affidavit and the accompanying applications and search warrants under seal.

Dated this 25th day of May, 2007.

Mark Weber
Special Agent
Internal Revenue Service
Criminal Investigations

Subscribed and sworn to before me
This 25th day of May, 2007, at San Diego, California.

ANTHONY J. BATTAGLIA
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**LOCATIONS TO BE SEARCHED**

**A-1**

**Travel World Services #3 / Mobile 1 Wireless**
**4701 University Avenue, San Diego, California**

The premises to be searched is for Travel World Services #3 (TWS#3) and Mobile 1
Wireless (Mobile 1), located at 4701 University Avenue, San Diego, California. TWS#3
/ Mobile 1 is located within a one story building at the southeast corner of 47th Street and
University Avenue. The words "Travel World" are displayed above the front door, just
above the numerals "4701". TWS#3 shares office space with two other businesses,
Mobile 1 and a law office. The scope of this search is for records of TWS#3, Mobile 1,
and for personal records of Tammie Huynh only. The front door of 4701 University
Avenue faces north and is accessible from the sidewalk on University Avenue. A photo
of the business is attached below. Upon entering the front door and facing right, several
chairs, a desk, and a table appear to be the travel services part of the business office.
Immediately on the left is the Mobile 1 business and in the back of the office on the right
is an enclosed area with the words, "Law Office" (not to be searched). No other
businesses appear to be operating in this office space though in the rear of the building,
on the second floor, appears to be related business storage units.

**A-2**

**Residence of Tammie Huynh**
**11358 Silver Oak Lane, San Diego, California**

The premises to be searched is located at 11358 Silver Oak Lane, San Diego, California.
The numbers 11358 are seen on the dwelling on the far right above the portico as viewed
from the street. It is a two story residential dwelling with a drive through portico and
detached garage behind the house, within the curtilage of the property. The exterior of
the residence is yellow in color with white trimming and brick columns. The residence is
covered with a red tile roof. A photo of the residence is attached below.

TRAVEL WORLD SERVICES #3 / Mobile 1 Wireless
4701 UNIVERSITY AVENUE
SAN DIEGO, CA



RESIDENCE OF TAMMIE HUYNH
11358 SILVER OAK LANE
SAN DIEGO, CA



## ATTACHMENT B

## ITEMS TO BE SEIZED

Certain items, documents, and records **limited to**:

1. Contracts, agreements, and correspondence regarding the purchase or sale of Travel World Services #3 (TWS#3) / Mobile 1 Wireless (Mobile 1);

2. All notebooks or any other records documenting the dates and amounts for sales, ticketing, or other services provided by TWS#3 / Mobile 1 for the time period January 2004 through March 2007;

3. All business financial records such as income statements, profit and loss statements, balance sheets, financial summaries, financial worksheets, general ledgers, subsidiary ledgers, cash receipts journal, cash disbursements journals, purchases journal, sales journals, sales invoices, lists of sales invoices, receipts, credit card statements, purchase receipts, billing and/or payment receipts, receivable reports, and receipt books, and accounts payable journals for TWS#3, Mobile 1, and/or Tammie Huynh for the time period January 2004 through March 2007;

4. Payroll records relating to business employees, including contracts, agreements, applications, payroll journals, payroll ledgers, time-cards, time-sheets, descriptions of duties, instructions to employees concerning the handling of cash or other forms of payment, payroll registers, pay stubs, schedules, calendars, correspondence from federal and state regulatory authorities, time logs, and notes of hours worked by employees for TWS#3 for the years 2004 through 2006;

5. Bank records, bank account applications, bank statements, savings passbooks, cancelled checks, deposit slips, duplicate deposit slips, duplicate checks, check registers, wire transfers, cashiers checks, money orders, promissory notes, and line of credit documents for TWS#3 and/or Tammie Huynh for the time period January 2004 through March 2007;

6. Address books, phone books, calendars, daily planners, electronic palm pilots or other personal digital systems, personal note recorder tapes, rolodex indices, and contact lists, which may be used to determine names, addresses, and/or telephone numbers for vendors to and customers of TWS#3, Mobile 1, and/or Tammie Huynh for the time period January 2004 through March 2007;

7. Retained copies of all Federal and state income tax returns, schedules, forms, tax return preparation instructions, tax preparation schedules, worksheets, Forms 1040, 1041, W-2, W-3, 940, 941, tax related documents and notes for the years 2004 through 2006 for Mobile 1 and/or Tammie Huynh;

8. Internal Revenue Service publications and documents, including correspondence and notices sent between the Internal Revenue Service and TWS#3 and Tammie Huynh for the years 2004 through 2006;

9. Inventory records establishing beginning and ending inventories including inventory sheets, valuation records, and records reflecting the purchase, basis, and depreciable life of assets and/or adjusted asset basis for TWS#3 for the years 2004 through 2006:

10. Lease agreements including applications, financial statements, collateral, credit and background investigations required, and payment records for TWS#3 and/or Tammie Huynh for the years 2004 through 2006;

11. Documentation of expenses including statements, receipts, credit card statements, and shipping documents for TWS#3 and/or Tammie Huynh for the time period January 2004 through March 2007;

12. Loan records including applications, financial statements, loan collateral, credit and background investigations required, agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans repayment records, including records revealing the date, amount and method of repayment for TWS#3 and/or Tammie Huynh for years 2004 through 2006;

13. Documentation or records of cash purchases or payments made in cash, including receipts, invoices, shipping receipts, cash register tapes, handwritten notes, applications, contracts, agreements, tickets, or records showing payment of expenses for the time period January 2004 through March 2007.

**which evidence will tend to prove the commission of: (a) evasion of income tax, in violation of 26 U.S.C. § 7201; (b) fraud and false statement, in violation of 26 U.S.C. § 7206(1); and (c) - structuring transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3).**

The terms "items," "documents" and "records" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

(a) Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the computer personnel) will make an initial review of any

computer equipment and storage devices to determine whether it is practical to perform an non-site search or make an on-site copy of the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data. Any copy made by the computer personnel will be a forensic image of the computer's entire storage devices. The forensic image will be transported to an appropriate law enforcement laboratory. The computer personnel will then review the forensic image in order to extract and seize any data that falls within the list of items to be seized set forth herein. The Government will retain all forensic images made of the computer's storage devices. Law enforcement personnel will make all reasonable efforts to perform an on-site search or make an on-site copy of the data within a reasonable amount of time.

(b) If the computer personnel determine it is not practical to perform an on-site search or make an on-site copy of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize data that falls within the list of items to be seized set forth herein. In order to extract and seize data that falls within the list of items to be seized set forth herein, the computer personnel will first make a forensic image of the computer's storage devices. The computer personnel will then review the forensic image in order to extract and seize any data that falls within the list of items to be seized set forth herein. After inspecting and imaging the seized computer equipment and storage devices, the Government will return them to the party from whom they were seized within 30 days from the date of seizure unless further authorization is obtained from the court. The Government will retain all forensic images made of the computer's storage devices.

(c) In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

(a) Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

(b) Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

(c) Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or

memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

(d) Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

(e) Any applications, utility programs, compliers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

(f) Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

(g) Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.